UNITED STATES DISTRICT COURT
DISRICT OF MINNESOTA

Robert Roe (a pseudonym) as parent and natural guardian
on behalf of Rebecca Roe (a pseudonym), a minor,

          Plaintiff,

vs.

                                       **Complaint and**
                                       **Jury Demand**

North Homes, Inc., individually and
d/b/a North Homes Children and Family Services,
I.T.A.S.K.I.N. Juvenile Center, and North Homes Cottage, and
Marie Marna Booth, in her individual capacity,
Connie Ross, in her individual and official capacities,
Jane Does 1 – 4, in their individual capacities, and
Jane Does 5 - 8, in their individual and official capacities.

          Defendants.

## Introduction

1.      Incarcerated minors are among the most vulnerable populations in the United States.  Placement in youth detention centers often increases the likelihood of a poor outcome, as the abuses these children experience while imprisoned compounds their serious, preexisting issues.  In 2012, a Bureau of Justice Statistics survey found that 1 in 10 incarcerated youth reported being sexually abused in such facilities.  This case involves a youth detention and residential treatment center where sexual abuse of its residents was blatant, rampant, and condoned.

2.      North Homes, Inc. owns and operates correctional and rehabilitative service facilities for juveniles at various locations in Northern Minnesota.  It claims that its

facilities provide comprehensive mental health services, including services to those who have been sexually exploited.  Children are supposed to heal at these facilities.  They are supposed to be safe.  Instead, North Homes facilities have become places where its staff members sexually abuse and prey on children, such as Rebecca Roe ("Rebecca") and others before her.

3.      This is an action for money damages for the violations of Rebecca's well-settled rights under the Eighth and/or Fourteenth Amendments to the United States Constitution.  Rebecca's father, Robert Roe ("Plaintiff") also alleges supplemental state law claims on Rebecca's behalf.  As a result of Defendants' failures, including conscience shocking behavior and a deliberate indifference to Rebecca's welfare and safety, Rebecca was sexual abused and suffered other severe and permanent injuries.

## Jurisdiction and Venue

4.      Plaintiff brings this action pursuant to the Eight and/or Fourteenth Amendment and 42 U.S.C. § 1983.  This Court therefore has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper under 28 U.S.C. §§ 1391(b)(1) and (2).

6.      The notice requirements of Minn. Stat. § 466.05 have been satisfied, to the extent necessary, as each Defendant hereto had sufficient facts to reasonably put them on notice.

## The Parties

7.     Rebecca is a minor child residing in the State of Minnesota, and was at all times material hereto.

8.     Robert is Rebecca's father who resides in the State of Minnesota, and was at all times material hereto.

9.     North Homes, Inc. ("North Homes") is a Minnesota nonprofit corporation, incorporated under the laws of the State of Minnesota.  Its registered office address is located at 303 First Street SE, Grand Rapids, MN 55744.

10.     North Homes operates under the registered, assumed name of North Homes Children and Family Services ("NH Services").

11.     North Homes either directly, or through NH Services, owns and operates two facilities under unregistered, assumed names, I.T.A.S.K.I.N. Juvenile Center ("ITASKIN") and North Homes Cottage ("NH Cottage").

12.     In operating ITASKIN and NH Cottage, North Homes worked in concert with Itasca and other Minnesota counties to provide care for minor children who were detained, incarcerated, committed, or the like, for criminal, mental health, or other protective purposes.

13.     ITASKIN and NH Cottage are located on adjacent properties.

14.     ITASKIN is and was located at 1880 River Road, Grand Rapids, MN 55744.

15.     ITASKIN has and had at all times material hereto units that were licensed by both the Minnesota Department of Human Services ("DHS") and the Minnesota

3

Department of Corrections ("DOC"), through the terms of an inter-agency agreement between DOC and DHS.

16.     In both the DOC-and-DHS licensed units at ITASKIN, the youth residents were under 24/7 supervision and were not free to leave on their own volition; their liberty was entirely restricted.

17.     North Homes maintained discretion under color of state law, for example through statutory and regulatory authority and/or court orders, to move its minor residents between the DOC-and-DHS licensed units at ITASKIN.

18.     ITASKINS's DOC-and-DHS licensed units shared managing employees, including but not limited to Connie Ross ("Ross"), and resources.

19.     NH Cottage is and was located at 1920 SE River Road, Grand Rapids, MN 55744.  NH Cottage is and was licensed by DHS.

20.     Given the common ownership and close geographic proximity, ITASKIN and NH Cottage would at times share management duties, resources, and managing employees, including but not limited to Ross.

21.     Given the common ownership, close geographic proximity, and the close relationship with local government, it was common for minors to move between the different units at ITASKIN and between ITASKIN and NH Cottage, depending on the level of security or type of treatment needed.  The discretion to move the minors as needed was typically left to North Homes staff.

22. Marie Marna Booth ("Booth") is twenty-nine years old, and at all times material hereto was a social worker employed by North Homes, who was assigned to the ITASKIN facility.

23. Ross is and was at all times material hereto a director and administrator for North Homes, with final policymaking authority, acting in her individual and official capacities. Upon information and belief, Ross resides in the State of Minnesota.

24. Jane Does 1 – 4 are presently unknown employees of North Homes, in their individual capacities, who owed Rebecca a duty of protection while Rebecca was a resident at ITASKIN and NH Cottage.

25. Jane Does 5 - 8 are presently unknown supervisors employed by North Homes, in their official and individual capacities, who owed Rebecca a duty of protection while Rebecca was a resident at ITASKIN and NH Cottage.

26. Booth, Ross, and Jane Does 1 – 8 were all mandatory reporters under Minnesota law.

### Known Prior Sexual Abuse at North Homes Facilities

27. In 1995, a North Homes employee, David Kist, pleaded guilty to engaging in criminal sexual conduct towards a 15-year-old female resident at ITASKIN.

28. In 2014, a North Homes employee, Devin Michael Wood, pleaded guilty to engaging in criminal sexual conduct towards a 15-year-old female resident at ITASKIN.

29. Upon information and belief, there have been other sexual abuses by North Home staff on minor residents that have not yet come to public attention.

5

30.    Inappropriate sexual contact and abuse of power are well-known hazards in group home situations, and juvenile detention and residential treatment centers, like North Homes, are no exception.  *See, e.g., Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905 (Minn. 1999).

### Rebecca's Placement and Serious Medical Needs

31.    In March 2016, Rebecca was 14 years old and was accused of committing juvenile crimes.

32.    On March 18, 2016, the Itasca County District Court ordered that Itasca County had legal and physical custody over Rebecca.

33.    Itasca County maintained legal and physical custody over Rebecca at all times material hereto.

34.    On March 18, 2016, the court also ordered that Rebecca be placed at ITASKIN, leaving North Homes with the discretion as to which unit Rebecca would be placed in (i.e., DOC or DHS licensed unit).

35.    ITASKIN had the authority and discretion to move Rebecca in-and-out of the DOC-licensed unit for behavioral reasons.

36.    Regardless of which unit Rebecca was placed in, she was court-ordered to remain at ITASKIN on a 24/7 basis from approximately March 18, 2016 through July 27, 2016.

37.    At or shortly upon her arrival at ITASKIN, Rebecca was diagnosed with objectively serious mental health and emotional disorders, including major depressive disorder, disruptive mood dysregulation disorder, generalized anxiety disorder,

provisional post-traumatic stress disorder, other specified disruptive, impulse control, and conduct disorder, and gender dysphoria in adolescents and adults.

38.     At or shortly upon her arrival at ITASKIN, it was determined that Rebecca was at a "serious risk of harm" due to the "indication or report of significant impulsivity and/or physical sexual aggression, with poor judgment and insight, that was significantly enduring to self or others."

39.     Rebecca had never been sexual active prior to her admission to ITASKIN.

40.     All North Homes staff, including Booth, Ross, and Jane Does 1 - 8, were made aware of and trained on Rebecca's objectively serious medical needs and the high risk of harm she posed to herself.

41.     All North Homes staff, including Booth and Jane Does 1 – 8, were supposed to receive training from a *Professional Boundaries* training manual.  It defined professional boundaries as "ethics or moral principles regarding the relationship a professional [had] with a [youth that] need[ed] to exist within a therapeutic relationship to ensure that the [youth was] not harmed."

42.     North Homes defined boundary violations to include:

   a.   Inappropriate physical contact

   b.   Continuation of relationship after the professional relationship ended

   c.   Sexual contact

   d.   Non-sexual physical contact

## Booth Preys Upon and Grooms Rebecca

43.     Beginning in April 2016, Booth began exhibiting grooming behavior towards Rebecca, with the intent of commencing a sexual relationship.

44.     Throughout the grooming period, Booth regularly breached multiple professional boundaries that were obvious to North Homes employees and supervisors and suggestive of an inappropriate relationship between Booth and Rebecca.

45.     Jane Does 1 – 4 either personally observed or were made aware of instances were Booth and Rebecca engaged in inappropriate activities with one another that put Jane Does 1 – 4 on notice that Booth and Rebecca were engaged in an inappropriate relationship that was romantic and/or sexual in nature.

46.     For example, one or more of the Jane Does 1 – 4 observed Booth sitting in Rebecca's room for **hours** with the doors **closed**.

47.     Jane Does 1 – 4 made supervisors, including but not limited to Jane Does 5 – 8 and Ross, aware of the inappropriate relationship between Booth and Rebecca.

48.     Jane Does 5 – 8 and Ross failed to take any action on the concerns raised by Jane Does 1 – 4, and as a result the inappropriate relationship between Rebecca and Booth continued with tacit approval.  The failure to take action or raise these concerns to higher authorities by Jane Does 5 – 8 was a failure of their mandatory reporter duties.

49.     After being aware of the inaction by Jane Does 5 – 8 and the continued inappropriate relationship between Booth and Rebecca, Jane Does 1 – 4 failed to raise their concerns about Rebecca to the appropriate authorities, as they were required to do as mandatory reporters.

50.     By the end of May 2016, Rebecca and Booth were in a romantic relationship, and were engaging in romantic and/or sexual activities at ITASKIN on a regular basis.

51.     For example, multiple youth at ITASKIN reported to Jane Does 1 - 4 that they observed Rebecca and Booth hugging and kissing, and this information was then provided to Jane Does 5 – 8 and Ross.

52.     In fact, one of the Jane Does 1 – 8 attempted to discourage **Rebecca** from continuing the relationship with Booth, stating that Rebecca was going to get Booth in trouble.

53.     Because of the widespread failures of Ross and Jane Does 1 - 8, Booth was able to continue her unlawful pursuit and grooming of Rebecca without obstruction and with the tacit approval of her co-workers and supervisors.

**Booth Helps Rebecca Escape from NH Cottages**

54.     On July 28, 2018, Rebecca was Court-ordered to enter a residential rehabilitation program.

55.     Rebecca was ordered to remain at ITASKIN until there was an opening at a residential rehabilitation program.

56.     ITASKIN retained the discretion to move Rebecca in-and-out of the DOC licensed unit until Rebecca was placed in a residential rehabilitation program.

57.     Rebecca was moved on or around July 28, 2018 to the NH Cottages.

58.     Booth encouraged or pressured Rebecca to attend residential treatment at NH Cottages so Rebecca could remain close to Booth; Rebecca succumbed.

59.     Rebecca was required to remain under the 24/7 care of North Homes at NH Cottages, and was not free to leave NH Cottages on her own volition.

60.     After Rebecca's placement in the NH Cottages, North Homes still retained the discretion to move Rebecca from NH Cottages to ITASKIN, including its DOC-licensed unit.

61.     Booth, in violation of NH Cottages' protocol, improperly visited with Rebecca at the NH Cottages.

62.     Ross and Jane Does 1 – 8 were aware of this improper visiting, which further put them on notice of the inappropriate relationship between Booth and Rebecca, yet they continued to do nothing.

63.     Booth knew that Rebecca intended to run away from NH cottages, encouraged Rebecca to do so, agreed to help Rebecca do so, and agreed that Rebecca could reside with Booth.

64.     Booth did this so that she could continue her unlawful grooming and sexual exploitation of Rebecca, a troubled minor with objectively serious medical needs.

65.     On or around August 1, 2016, prior to Rebecca running away from NH Cottages, one of Rebecca's family members called NH Cottages or other North Homes staff to inform them that Rebecca was going to attempt to run away from NH Cottages.

66.     North Homes staff made no effort to ensure Rebecca was secure.

67.     Rebecca ran away from NH Cottages on the evening of August 1, 2016, and Booth helped her.

68.     Rebecca waited to run until Booth finished her shift at ITASKIN, then Booth helped Rebecca flee NH Cottages.

69.     Booth drove Rebecca in her vehicle back to Booth's residence.

70.     Booth hid Rebecca at her residence for nearly three months.

71.     Over that three-month period, Booth continued to engage in an unlawful sexual relationship with Rebecca, which included performing sexual acts on Rebecca and having Rebecca perform sexual acts onto her.

72.     Over that three-month period, Booth hid Rebecca inside a "cubby" in an upstairs room at Booth's house to keep her undetected, and Rebecca was only allowed out when no one else but Booth was around, often requiring Rebecca to pee in a cup inside the cubby.

73.     In addition to the many sexual acts, Booth tattooed Rebecca with an image intended to serve as a symbolic and permanent reminder of activities from the grooming stages of their unlawful relationship.

74.     During the time Booth illegally harbored Rebecca at her residence, Ross and Jane Does 1 - 8 knew or had reason to know that Rebecca was residing with Booth, but they failed to report that information to the proper authorities as they were required to do as mandatory reporters.  Worse yet, they listened to Booth brag in detail about her sexual conquests yet did nothing.

75.     Officers from the Grand Rapids Police Department found Rebecca hiding in Booth's residence on October 24, 2016.

76.     Booth remained an employee of North Homes, Inc. throughout the entirety of the time she was hiding Rebecca at her residence and sexually abusing her.

77.     Booth was charged with felony Depriving Another of Custodial or Parental Rights and felony Criminal Sexual Conduct in the First Degree.

78.     Booth pleaded guilty to both counts and was convicted on January 29, 2018.

79.     As described above, all of Booth's unlawful conduct towards Rebecca was detrimental towards Rebecca's serious medical needs and prescribed treatment for those serious medical needs.

80.     Booth's actions were foreseeable, related to, and connected with acts otherwise within the scope of her employment at North Homes.

81.     The source of Booth's sexual misconduct towards Rebecca was related to the duties of her employment.

82.     Booth's acts could not have occurred but for her employment at North Homes.

83.     During the time that Rebecca was being harbored by Booth, Jane Does 1 – 8 and Ross were in possession of information that Rebecca was likely residing with Booth, but Jane Does 1 – 8 and Ross failed to report that information to authorities as they were required to do as mandatory reporters.  Given Jane Does 1 – 8 and Ross's knowledge of the inappropriate relationship between Rebecca and Booth at ITASKIN, Jane Does 1 – 8 and Ross were deliberately indifferent to the fact that Rebecca and Booth were likely engaging in an unlawful, sexual relationship while Rebecca was missing.  As

a result, Booth's unlawful relationship with Rebecca was able to continue freely and with the tacit approval of North Homes.

## The DHS Investigation

84.     DHS conducted an investigation into these events, and issued a determination of maltreatment on or around January 17, 2017, which was subsequently amended.

85.     DHS investigated three separate allegations against Booth and the North Homes facilities.

86.     The first allegation was that Booth exhibited inappropriate boundaries with Rebecca while Rebecca was at ITASKIN, and that staff at ITASKIN was aware of the inappropriate relationship.

87.     DHS found that Booth's conduct constituted neglect of Rebecca's serious needs.

88.     DHS also found that ITASKIN, as an entity, was responsible for neglecting Rebecca's serious needs because "multiple staff persons had concerns between April 21 and August 1, 2016, regarding [Booth's] boundaries with [Rebecca] yet no action was taken regarding the concerns…"

89.     DHS found that this neglect "likely hindered [Rebecca's] ability to have a consistent understanding of the parameters of a therapeutic relationship which could interfere with other individuals' attempts to provide [Rebecca] with therapeutic services both now and in the future."

90.     The second DHS allegation was that Booth helped Rebecca run away from NH Cottages.

91.     DHS concluded that "there was a preponderance of evidence that [Booth] either helped [Rebecca] run away from [NH Cottages] and/or picked [Rebecca] up shortly after [Rebecca] ran from the facility which was a failure to supply [Rebecca] with necessary care and a failure to protect [Rebecca] from conditions or actions that seriously endanger [Rebecca's] physical or mental health when reasonably able to do so."

92.     The third DHS allegation was that Rebecca resided with Booth while Rebecca was missing and that Booth engaged in a sexual relationship with Rebecca during that time.

93.     DHS determined by a preponderance of the evidence that Rebecca did reside with Booth while Rebecca was missing, and that an unlawful sexual relationship occurred during that time.

94.     Booth was disqualified from providing direct services as a result of these findings.

95.     Upon information and belief, Ross was identified as "P7" in the DHS report.

96.     Upon information and belief, DHS found that Ross "was made aware by multiple staff persons that [Booth] may have helped [Rebecca] run away from the facility, that [Rebecca] and [Booth] may have been in a relationship, and that [Rebecca] may have been staying at [Booth's] residence."

97. Upon information and belief, Ross failed to report this information "as required."

98. Upon information and belief, Ross was initially "disqualified from a position allowing direct contact with, or access to, persons receiving services from facilities licensed by the Department of Human Services, the Department of Health, facilities serving children or youth licensed by the Department of Corrections, and unlicensed Personal Care Provider Organizations."

99. Upon information and belief, DHS rescinded Ross's disqualification based upon a settlement agreement reached while Ross's disqualification was on appeal.

100. Despite the massive failures by Ross as observed by DHS, Ross remains in her position of significant authority at North Homes today.

101. Despite the massive and widespread failures by North Homes employees as observed by DHS, North Homes claims that it "completed an *Internal Review* and determined that facility policies and procedures were adequate and followed by staff persons and that no additional training was necessary."

102. Despite these horrific findings of maltreatment against North Homes and its employees, DHS only required North Homes to pay a $1,400 fine.

## Count I
## 42 U.S.C. § 1983 Individual Violations
*Plaintiff v. Booth, Ross, and Jane Does 1 – 8 in their individual capacities*

103. Plaintiff re-alleges each preceding paragraph as if fully set forth herein.

104. The Defendants named in this Count had a clearly established constitutional duty to provide for Rebecca's medical needs, personal safety, and general welfare.

105.    Although the Defendants named in this Count were employed by a nominally private entity, i.e., North Homes, they acted under color of state law because North Homes fulfilled the public function of juvenile incarceration, detainment, and commitment, and acted in concert with state actors in denying Rebecca her federal civil rights.

106.    By the actions described above, Booth, under color of state law and in her individual capacity, acted with deliberate indifference to Rebecca's serious medical needs, personal safety, and general welfare in violation of Rebecca's Eighth and/or Fourteenth Amendment rights.

107.    By the actions described above, Booth, under color of state law and in her individual capacity, engaged in conduct that was so outrageous that it shocks the conscience so as to constitute a violation of Rebecca's Fourteenth Amendment substantive due process rights.

108.    By the actions described above, Ross and Jane Does 1 – 8, under color of state law and in their individual capacities, acted with deliberate indifference to Rebecca's serious medical needs, personal safety, and general welfare in violation of Rebecca's Eighth and/or Fourteenth Amendment rights by failing to intervene to stop the unconstitutional actions taken by Booth towards Rebecca, despite having a realistic opportunity to do so.  Ross and Jane Does 1 – 8 acted either maliciously, with reckless disregard, or with deliberate indifference towards whether Rebecca's rights would be violated by Booth's actions and their failure to intervene.

109.    By the actions described above, Ross and Jane Does 5 - 8, under color of state law and in their individual capacities as supervisors, had actual or constructive notice of their subordinates' unconstitutional conduct, but acted with deliberate indifference to or authorized these serious violations of Rebecca's constitutional rights. These supervisors also failed to take any remedial action after becoming aware of these violations.

110.    Rebecca has endured and will endure pain, suffering, humiliation, and embarrassment as a direct and proximate result of these Defendants' acts and omissions in addition to other categories of compensatory damages.

111.    Rebecca has incurred and will incur medical expenses as a direct and proximate result of these Defendants' acts and omissions, in addition to other categories of special damages.

112.    The Defendants named in this Count subjected Rebecca to these deprivations of her rights in such a manner so as to render these Defendants liable for punitive damages as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such are not subject to the pleadings requirements or the differing standards of proof set forth in Minn. Stat. § 549.20.

113.    Plaintiff is entitled to recover costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

114.    Plaintiff is entitled to compensatory and punitive damages in an amount exceeding TEN MILLION ($10,000,000.00) DOLLARS.

<u>**Count II**</u>
**42 U.S.C. § 1983 *Monell* Violation**
*Plaintiff v. North Homes, Inc. and Ross in her official capacity*

115.   Plaintiff realleges each preceding paragraph as if fully set forth herein.

116.   Although North Homes is a nominally private entity, it acted under color of state law because North Homes fulfilled the public function of juvenile incarceration, detainment, and commitment, and acted in concert with state actors in denying Rebecca her federal civil rights.  By virtue of her employment, Ross acted under color of state law as well.

117.   North Homes, and its final policymakers such as Ross, with deliberate indifference to the rights of Rebecca and other similarly situated children, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that created an atmosphere where children at North Homes were regularly subjected to sexual abuse.

118.   North Homes' staff regularly turned a blind eye towards inappropriate and sexual relationships between residents and staff.

119.   These customs, patterns, or practices, were the moving force behind Rebecca's injuries.

120.   Rebecca as endured and will endure pain, suffering, humiliation, and embarrassment as a direct and proximate result of North Homes' acts and omissions in addition to other categories of compensatory damages.

121.   Rebecca has incurred and will incur medical expenses as a direct and proximate result of North Homes' acts and omissions, in addition to other categories of special damages.

122.   Plaintiff is entitled to recover costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

123.   Plaintiff is entitled to compensatory damages in an amount exceeding FIVE MILLION ($5,000,000.00) DOLLARS.

**COUNT III**
**42 U.S.C. § 1983 *City of Canton v. Harris***
*Plaintiff v. North Homes, Inc.*

124.   Plaintiff realleges each preceding paragraph as if fully set forth herein.

125.   Although North Homes is a nominally private entity, it acted under color of state law because North Homes fulfilled the public function of juvenile incarceration, detainment, and commitment, and acted in concert with state actors in denying Rebecca her federal civil rights.

126.   North Homes, with deliberate indifference to the children in its care, failed to properly train employees and failed to adopt, implement, or require adherence to appropriate policies related to mandatory reporting and inappropriate or unlawful relationships between North Homes employees and its minor residents.

127.   North Homes, by such conduct, demonstrated deliberate indifference and a protracted failure to care for the safety and welfare of Rebecca and other vulnerable children like Rebecca.

128.    As a direct and proximate result of the acts and omissions of the

Defendants named in this Count, North Homes is liable to Plaintiff in an amount

exceeding FIVE MILLION ($5,000,000.00) DOLLARS.

### Count IV
### Negligence and Professional Malpractice
*Plaintiff v. All Defendants*

129.    Plaintiff realleges each preceding paragraph as if fully set forth herein.

130.    All of the Defendants owed Rebecca a duty of care.

131.    Booth breached that standard of care by the following acts and omissions,

but for reasons not limited to these acts and omissions: (1) grooming Rebecca while

Rebecca resided in North Homes' facilities; (2) engaging in a romantic and/or sexual

relationship with Rebecca while Rebecca resided in North Homes' facilities; (3) helping

Rebecca run away from NH Cottages; and (4) by harboring Rebecca and continuing to

engage in a romantic and/or sexual relationship with her.

132.    Ross and Jane Does 1 - 8 breached the standard of care by the following

acts and omissions, but for reasons not limited to these acts and omissions: (1) allowing

Booth to groom and engage in a romantic and/or sexual relationship with Rebecca while

Rebecca resided in North Homes' facilities; (2) not making mandatory reports regarding

potential sexual abuse under Minnesota law; and (3) by failing to provide information to

authorities that there was reason to believe Booth was harboring Rebecca at her home and

likely subjecting her to sexual abuse.

133.    Booth, Ross, and Jane Does 1 – 8 breached numerous ministerial duties in the course of their negligence, and breached these duties within the course and scope of their duties as North Homes employees.

134.    North Homes is liable for the acts and omissions of its individual employees under the doctrine of respondeat superior.  *See Fahrendorff*, 597 N.W.2d 905.

135.    North Homes was, among other reasons, directly negligent in failing to properly train and supervise its employees and in failing to implement proper policies to ensure that minor residents in North Homes facilities would not be groomed and sexually abused by North Homes employees.

136.    North Homes' numerous breaches and failures occurred at the operational level.

137.    To the extent any of the Defendants herein are considered "health care providers" pursuant to Minn. Stat. § 145.682, subd. 1, their negligence amounts to a breach of the standard of care.  A Declaration of Expert Review shall be filed and served herewith.

138.    Rebecca has endured and will endure pain, suffering, humiliation, and embarrassment as a direct and proximate result of North Homes' acts and omissions in addition to other categories of compensatory damages.

139.    Rebecca has incurred and will incur medical expenses as a direct and proximate result of North Homes' acts and omissions, in addition to other categories of special damages.

140.     Plaintiff is entitled to compensatory damages in an amount exceeding TEN

MILLION ($10,000,000.00) DOLLARS.

**<u>Prayer for Relief</u>**

WHEREAS, Plaintiff prays for judgment against Defendants as follows:

1.      As to Count I, a money judgment against Booth, Ross, and Jane Does 1 – 8

for compensatory and punitive damages in an amount exceeding TEN MILLION

($10,000,000.00) DOLLARS together with costs, including reasonable attorneys' fees,

under 42 U.S.C. § 1988 and prejudgment interest;

2.      As to Count II, a money judgment against North Homes and Ross for

compensatory damages in an amount exceeding FIVE MILLION ($5,000,000.00)

DOLLARS together with costs, including reasonable attorneys' fees, under 42 U.S.C. §

1988 and prejudgment interest;

3.      As to Count III, a money judgment against North Homes for compensatory

damages in an amount exceeding FIVE MILLION ($5,000,000.00) DOLLARS together

with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988  and

prejudgment interest;

4.      As to Count IV, a money judgment against All Defendants for

compensatory damages in an amount exceeding TEN MILLION ($10,000,000.00)

DOLLARS together with costs and prejudgment interest;

5.      Also as to Counts II, III, and IV, appropriate injunctive relief necessary to

cease the unconstitutional or otherwise unlawful policies, practices, and customs

described herein.

**A TRIAL BY JURY IS HEREBY DEMANDED**

**Dated: December 18, 2018**

**SIEBENCAREY, P.A.**

/s/ Jeffrey M. Montpetit
Jeffrey M. Montpetit, #291249
901 Marquette Ave., Suite 500
Minneapolis, MN 55402
Telephone: 612.333.4500
Fax: 612.333.5970
jeffrey.montpetit@knowyourrights.com

**NEWMARK STORMS DWORAK LLC**

/s/ Jeffrey S. Storms
Jeffrey S. Storms, #0387240
Paul C. Dworak, #391070
100 South 5th Street, Suite 2100
Minneapolis, MN 55402
Telephone: 612.455.7050
Fax: 612.455.7051
jeff@newmarkstorms.com
paul@newmarkstorms.com