UNITED STATES DISTRICT COURT
DISRICT OF MINNESOTA

---

Robert Roe (a pseudonym) as parent and natural guardian
on behalf of Rebecca Roe (a pseudonym), a minor,

        Plaintiff,                  Case No. 18-cv-03428 (PAM/LIB)

vs.

North Homes, Inc., individually and
d/b/a North Homes Children and Family Services,
I.T.A.S.K.I.N. Juvenile Center, and North Homes Cottage, and
Marie Marna Booth, in her individual capacity,
Connie Ross, in her individual and official capacities,
Jane Does 1 – 4, in their individual capacities, and
Jane Does 5 - 8, in their individual and official capacities.

        Defendants.

---

**Memorandum in Opposition to Motion to Dismiss by North Homes Defendants**

---

## Introduction

North Homes wants the privilege and financial benefit of providing detention and correctional services in Minnesota, it just wants none of the responsibilities that come with it. North Homes and its employees operate under the color of state law. As such, the Defendants can be held accountable under Section 1983 for the sexual abuse, and other wrongs, Rebecca Roe suffered at the hands of North Homes employees. Plaintiff has plausibly alleged violations of Rebecca's Fourteenth Amendment rights against the North Homes Defendants. The North Homes Defendants' motion to dismiss should be denied. To the extent the Court grants any part of this motion, any dismissal should be

without prejudice and the Court should continue to assert supplemental jurisdiction over

this matter.

## **Table of Contents**

I.    Factual Background......................................................................................... 3

    A.    North Homes ........................................................................................ 3

    B.    Connie Ross.......................................................................................... 6

    C.    Sexual abuse at North Homes ............................................................. 6

    D.    Rebecca suffered sexual abuse due to the deliberate indifference
        of North Homes and its employees ................................................... 7

    E.    The DHS investigation revealed widespread wrongdoing by
        North Homes and its employees.................................................... 13

II.    Standard of Review ...................................................................................... 15

III.    Argument...................................................................................................... 16

    A.    The North Homes Defendants acted under color of state law..................... 17

        1.    *Whether private actors can be held liable under Section 1983
            requires a fact-bound inquiry*.......................................................... 17

        2.    *North Homes does not <u>just</u> provide residential treatment; it also
            provides detention and correctional services* .................................. 19

        3.    *North Homes satisfies the public function test* ................................ 21

        4.    <u>*Giron*</u> *is instructive*.......................................................................... 23

        5.    *Juvenile treatment facilities providing correctional and detention
            services are akin to private prisons* .................................................. 24

        6.    *The common thread is the ability to deprive liberty* ........................ 26

        7.    *The North Homes Defendants' case law is irrelevant* ..................... 27

        8.    *North Homes also satisfies the joint action test* ............................... 30

9. *North Homes is as much a state actor as the private parties in* <u>*Americans United*</u>, <u>*High Pipe*</u>, <u>*New Horizon*</u>, <u>*Giron*</u>, *and all the other private prison and detention center cases* .................31

10. *The State of Minnesota intended to delegate its constitutional responsibilities to North Homes – North Homes is required to provide its residents with "<u>Due Process</u>"* ........................................32

B. Plaintiff plausibly alleges individual violations of Rebecca's Fourteenth Amendment rights by Ross and Jane Does 1- 8 ..........................................33

1. *Plaintiff plausibly alleges that Booth violated Rebecca's Fourteenth Amendment rights* ..........................................33

2. *Plaintiff plausibly alleges that Ross and Jane Does 1- 8 failed to intervene to stop Booth's unconstitutional conduct* ..........36

3. *Plaintiff plausibly alleges that Ross and Jane Does 5 – 8 are subject to supervisory liability* ....................................37

C. Plaintiff alleges a plausible *Monell* claim ...................................38

D. Plaintiff alleges a plausible *Canton* claim...................................41

E. The dismissal of <u>any</u> claim should be without prejudice given the early stage of the proceedings ..............................................................42

F. The Court should exercise supplemental jurisdiction over the state law claims ...................................................................................43

V. Conclusion.........................................................................................44

# I. Factual Background

## A. North Homes

At all times material hereto, North Homes, Inc. ("North Homes") owned and operated correctional and rehabilitative service facilities for juveniles at various locations in Northern Minnesota.[1]  One of the facilities North Homes operated was the

---

[1] ECF No. 1, Complaint ¶ 2.

I.T.A.S.K.I.N. Juvenile Center ("ITASKIN"), in Grand Rapids, Minnesota.[2]  In operating ITASKIN, North Homes worked in concert with Itasca and other Minnesota counties to provide care for minor children who were detained, incarcerated, committed, or the like, for criminal, mental health, or other protective purposes.[3]

ITASKIN had units that were licensed by both the Minnesota Department of Corrections ("DOC") and the Department of Human Services ("DHS"), though an inter-agency agreement between those entities.[4]  In both the DOC- and DHS-licensed units at ITASKIN, the youth residents were under 24/7 supervision and were not free to leave on their own volition; their liberty was entirely restricted.[5]  North Homes maintained discretion under color of state law, for example through statutory and regulatory authority and/or court orders, to move its minor residents between the DOC- and-DHS-licensed units at ITASKIN.[6]

North Homes also operated the North Homes Cottage ("NH Cottage"), which was located on an adjacent property from ITASKIN.[7]  In operating NH Cottage, which was licensed by the DHS, North Homes worked in concert with Itasca and other Minnesota counties to provide care for minor children who were detained, incarcerated, committed, or the like, for criminal, mental health, or other protective purposes.[8]  Given the common

---

[2] *Id.* ¶¶ 10-14.
[3] *Id.* ¶ 12.
[4] *Id.* ¶ 15; s*ee also* Storms Dec. Ex. A at *1, Minnesota Department of Human Services Licensing Information Lookup, "I.T.A.S.K.I.N. Juvenile Center." (hereinafter "DHS Lookup").
[5] *Id.* ¶ 16.
[6] *Id.* ¶ 17.
[7] *Id.* ¶¶ 11 – 13.
[8] *Id.* ¶ 12.

ownership and close geographic proximity, ITASKIN and NH Cottage would at times share management duties, resources, and managing employees, including but not limited to Ross.[9]  Given the common ownership, close geographic proximity, and the close relationship with local government, it was common for minors to move between the different units at ITASKIN and between ITASKIN and NH Cottage, depending on the level of security or type of treatment needed.[10]  The discretion to move the minors as needed was typically left to North Homes staff.[11]

North Homes is (and was) governed, in part, by Minnesota Administrative Rules 2960.0010 – 2960.0710.[12]  ITASKIN is governed by Minnesota Administrative Rules 2960.0230 – 2960.0290 because it was "a facility that provides detention services on a 24-hour basis to a juvenile who is alleged to be a delinquent, an adjudicated delinquent, an extended jurisdictional juvenile, or a child in need of protection on a pre-dispositional status…."[13]  Critically, facilities like North Homes that provide for juvenile detention are required to afford children with **due process**: "The license holder must include in the disciplinary plan a system of due process that has been reviewed by the commissioner of corrections."  Minn. Admin. R. 2960.0270, subp. 6(B); *see also* entirety of Subpart 6.

---

[9] *Id.* ¶ 20.
[10] *Id.* ¶ 21.
[11] *Id.*
[12] DHS Lookup at *2.
[13] *Id.*; *see also* Storms Dec. Ex. B, DOC Facility Inspection Report.

### B.      Connie Ross

Ross was a director and administrator for North Homes, with final policymaking authority for North Homes.[14]  In this position at ITASKIN, Ross was a "Detaining Authority" in accordance with Rule 5.02, subdivision 2 of the Minnesota Rule of Juvenile Delinquency Procedure: "The detaining officer, the detaining officer's supervisor, **the person in charge of the detention facility**, the prosecuting attorney or the court is a detaining authority for the purposes of this rule."[15]

### C.      Sexual abuse at North Homes

In 1995, North Homes employee David Kist pleaded guilty to engaging in criminal sexual conduct towards a 15-year-old, female, ITASKIN resident.[16]  *See, e.g., Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905 (Minn. 1999) (establishing North Homes' vicarious liability for the sexual assaults of its employees).  In 2014, only two years prior to the events of this case, North Homes employee Devin Wood engaged in sexual misconduct towards a North Homes minor resident.[17]  Plaintiff alleges that there have been other sexual abuses by North Homes staff on minor residents that have not yet come to public attention.[18]

---

[14] *Id.* ¶ 23.
[15] *See also Doe v. North Homes*, Case No. 18-cv-03419 (WMW/LIB), ECF No. 1, Complaint ¶ 46.
[16] *Id.* ¶ 27.
[17] *See Doe v. North Homes*, Case No. 18-cv-03419 (WMW/LIB), ECF No. 1, Complaint *generally*.
[18] Complaint ¶ 29.

## D.      Rebecca suffered sexual abuse due to the widespread deliberate indifference of North Homes and its employees.

In March 2016, Rebecca was 14 years old and was accused of committing juvenile crimes.[19]  On March 18, 2016, the Itasca County District Court ordered that Itasca County had legal and physical custody over Rebecca.[20]  Itasca County maintained legal and physical custody over Rebecca at all times material hereto.[21]  On March 18, 2016, the court also ordered that Rebecca be placed at ITASKIN, leaving North Homes with the discretion as to which unit Rebecca would be placed in (i.e., DOC- or DHS-licensed unit).[22]  ITASKIN had the authority and discretion to move Rebecca in-and-out of the DOC-licensed unit for behavioral reasons.[23]  Regardless of which unit Rebecca was placed in, she was court-ordered to remain at ITASKIN on a 24/7 basis from approximately March 18, 2016 through July 27, 2016.[24]

At or shortly upon her arrival at ITASKIN, Rebecca was diagnosed with objectively serious mental health and emotional disorders, including major depressive disorder, disruptive mood dysregulation disorder, generalized anxiety disorder, provisional post-traumatic stress disorder, other specified disruptive, impulse control, and conduct disorder, and gender dysphoria in adolescents and adults.[25]  At or shortly upon her arrival at ITASKIN, it was determined that Rebecca was at a "serious risk of harm"

---

[19] *Id.* ¶ 31.
[20] *Id.* ¶ 32
[21] *Id.* ¶ 33.
[22] *Id.* ¶ 34.
[23] *Id.* ¶ 35.
[24] *Id.* ¶ 36.
[25] *Id.* ¶ 37.

due to the "indication or report of significant impulsivity and/or physical sexual aggression, with poor judgment and insight, that was significantly enduring to self or others."[26]  Rebecca had never been sexual active prior to her admission to ITASKIN.[27]

All North Homes staff, including Booth, Ross, and Jane Does 1 - 8, were made aware of and trained on Rebecca's objectively serious medical needs and the high risk of harm she posed to herself.[28]  All North Homes staff, including Booth and Jane Does 1 – 8, were supposed to receive training from a *Professional Boundaries* training manual.[29] It defined professional boundaries as "ethics or moral principles regarding the relationship a professional [had] with a [youth that] need[ed] to exist within a therapeutic relationship to ensure that the [youth was] not harmed."[30]  North Homes defined boundary violations to include: (a) inappropriate physical contact; (b) continuation of relationship after the professional relationship ended; (c) Sexual contact; and (d) Non-sexual physical contact.[31]

Beginning in April 2016, Booth began exhibiting grooming behavior towards Rebecca, with the intent of commencing a sexual relationship.[32]  Throughout the grooming period, Booth regularly breached multiple professional boundaries that were obvious to North Homes employees and supervisors and suggestive of an inappropriate

---

[26] *Id.* ¶ 38.
[27] *Id.* ¶ 39.
[28] *Id.* ¶ 40.
[29] *Id.* ¶ 41.
[30] *Id.*
[31] *Id.* ¶ 42.
[32] *Id.* ¶ 43.

relationship between Booth and Rebecca.[33]  Jane Does 1 – 4 either personally observed or were made aware of instances where Booth and Rebecca engaged in inappropriate activities with one another that put Jane Does 1 – 4 on notice that Booth and Rebecca were engaged in an inappropriate relationship that was romantic and/or sexual in nature.[34] For example, one or more of the Jane Does 1 – 4 observed Booth sitting in Rebecca's room for **hours** with the doors **closed**.[35]

Jane Does 1 – 4 made supervisors, including but not limited to Jane Does 5 – 8 and Ross, aware of the inappropriate relationship between Booth and Rebecca.[36]  Jane Does 5 – 8 and Ross failed to take any action on the concerns raised by Jane Does 1 – 4, and as a result the inappropriate relationship between Rebecca and Booth continued with tacit approval.[37]  The failure to take action or raise these concerns to higher authorities by Jane Does 5 – 8 was a failure of their mandatory reporter duties.[38]  After being aware of the inaction by Jane Does 5 – 8 and the continued inappropriate relationship between Booth and Rebecca, Jane Does 1 – 4 failed to raise their concerns about Rebecca to the appropriate authorities, as they were required to do as mandatory reporters.[39]

By the end of May 2016, Rebecca and Booth were in a romantic relationship, and were engaging in romantic and/or sexual activities at ITASKIN on a regular basis.[40]  For

---

[33] *Id.* ¶ 44.
[34] *Id.* ¶ 45.
[35] *Id.* ¶ 46.
[36] *Id.* ¶ 47.
[37] *Id.* ¶ 48.
[38] *Id.*
[39] *Id.* ¶ 49.
[40] *Id.* ¶ 50.

example, multiple youth at ITASKIN reported to Jane Does 1 - 4 that they observed Rebecca and Booth hugging and kissing, and this information was then provided to Jane Does 5 – 8 and Ross.[41]  In fact, one of the Jane Does 1 – 8 attempted to discourage **Rebecca** from continuing the relationship with Booth, stating that Rebecca was going to get Booth in trouble.[42]  Because of the widespread failures of Ross and Jane Does 1 - 8, Booth was able to continue her unlawful pursuit and grooming of Rebecca without obstruction and with the tacit approval of her co-workers and supervisors.[43]

On July 28, 2018, Rebecca was Court-ordered to enter a residential rehabilitation program.[44]  Rebecca was ordered to remain at ITASKIN until there was an opening at a residential rehabilitation program.[45]  ITASKIN retained the discretion to move Rebecca in-and-out of the DOC licensed unit until Rebecca was placed in a residential rehabilitation program.[46]

Rebecca was moved on or around July 28, 2018 to the NH Cottages.[47]  Booth encouraged or pressured Rebecca to attend residential treatment at NH Cottages so Rebecca could remain close to Booth; Rebecca succumbed.[48]  Rebecca was required to remain under the 24/7 care of North Homes at NH Cottages, and was not free to leave NH Cottages on her own volition.[49]  After Rebecca's placement in the NH Cottages,

---

[41] *Id.* ¶ 51.
[42] *Id.* ¶ 52.
[43] *Id.* ¶ 53.
[44] *Id.* ¶ 54.
[45] *Id.* ¶ 55.
[46] *Id.* ¶ 56.
[47] *Id.* ¶ 57.
[48] *Id.* ¶ 58.
[49] *Id.* ¶ 59.

North Homes still retained the discretion to move Rebecca from NH Cottages to ITASKIN, including its DOC-licensed unit.[50]

Booth, in violation of NH Cottages' protocol, improperly visited with Rebecca at the NH Cottages.[51]  Ross and Jane Does 1 – 8 were aware of this improper visiting, which further put them on notice of the inappropriate relationship between Booth and Rebecca, yet they continued to do nothing.[52]  Booth knew that Rebecca intended to run away from NH cottages, encouraged Rebecca to do so, agreed to help Rebecca do so, and agreed that Rebecca could reside with Booth.[53]  Booth did this so that she could continue her unlawful grooming and sexual exploitation of Rebecca, a troubled minor with objectively serious medical needs.[54]

On or around August 1, 2016, prior to Rebecca running away from NH Cottages, one of Rebecca's family members called NH Cottages or other North Homes staff to inform them that Rebecca was going to attempt to run away from NH Cottages.[55]  North Homes staff made no effort to ensure Rebecca was secure.[56]

Rebecca ran away from NH Cottages on the evening of August 1, 2016, and Booth helped her.[57]  Rebecca waited to run until Booth finished her shift at ITASKIN, then

---

[50] *Id.* ¶ 60.
[51] *Id.* ¶ 61.
[52] *Id.* ¶ 62.
[53] *Id.* ¶ 63.
[54] *Id.* ¶ 64.
[55] *Id.* ¶ 65.
[56] *Id.* ¶ 66.
[57] *Id.* ¶ 67.

Booth helped Rebecca flee NH Cottages.[58]  Booth drove Rebecca in her vehicle back to Booth's residence. [59]  Booth hid Rebecca at her residence for nearly three months.[60]

Over that three-month period, Booth continued to engage in an unlawful sexual relationship with Rebecca, which included performing sexual acts on Rebecca and having Rebecca perform sexual acts onto her.[61]  Over that three-month period, Booth hid Rebecca inside a "cubby" in an upstairs room at Booth's house to keep her undetected, and Rebecca was only allowed out when no one else but Booth was around, often requiring Rebecca to pee in a cup inside the cubby.[62]  In addition to the many sexual acts, Booth tattooed Rebecca with an image intended to serve as a symbolic and permanent reminder of activities from the grooming stages of their unlawful relationship.[63]

During the time Booth illegally harbored Rebecca at her residence, Ross and Jane Does 1 - 8 knew or had reason to know that Rebecca was residing with Booth, but they failed to report that information to the proper authorities as they were required to do as mandatory reporters.[64]  Worse yet, they listened to Booth brag in detail about her sexual conquests yet did nothing.[65]  Officers from the Grand Rapids Police Department found Rebecca hiding in Booth's residence on October 24, 2016.[66]  Booth remained an employee of North Homes, Inc. throughout the entirety of the time she was hiding

---

[58] *Id.* ¶ 68.
[59] *Id.* ¶ 69.
[60] *Id.* ¶ 70.
[61] *Id.* ¶ 71.
[62] *Id.* ¶ 72.
[63] *Id.* ¶ 73.
[64] *Id.* ¶ 74.
[65] *Id.*
[66] *Id.* ¶ 75.

Rebecca at her residence and sexually abusing her.[67]  Booth was charged with felony

Depriving Another of Custodial or Parental Rights and felony Criminal Sexual Conduct

in the First Degree.[68]  Booth pleaded guilty to both counts and was convicted on January

29, 2018.[69]

   E.   **The DHS investigation revealed widespread wrongdoing by North Homes and its employees.**

   DHS conducted an investigation into these events, and issued a determination of

maltreatment on or around January 17, 2017, which was subsequently amended.[70]  DHS

investigated three separate allegations against Booth and the North Homes facilities.[71]

   The first allegation was that Booth exhibited inappropriate boundaries with

Rebecca while Rebecca was at ITASKIN, and that staff at ITASKIN was aware of the

inappropriate relationship.[72]  DHS found that Booth's conduct constituted neglect of

Rebecca's serious needs.[73]  DHS also found that ITASKIN, as an entity, was responsible

for neglecting Rebecca's serious needs because "multiple staff persons had concerns

between April 21 and August 1, 2016, regarding [Booth's] boundaries with [Rebecca] yet

no action was taken regarding the concerns…".[74]  DHS found that this neglect "likely

---

[67] *Id.* ¶ 76.
[68] *Id.* ¶ 77.
[69] *Id.* ¶ 78.
[70] *Id.* ¶ 84; *see also* Storms Dec. Ex. C, Amended Investigation Memorandum (1/17/17, as amended 8/22/17).  This is a publicly available document, and its investigative findings have been heavily incorporated into Plaintiff's Complaint.  Therefore, it is appropriate for this Court to take judicial notice of this document.
[71] Complaint ¶ 85.
[72] *Id.* ¶ 86.
[73] *Id.* ¶ 87.
[74] *Id.* ¶ 88.

hindered [Rebecca's] ability to have a consistent understanding of the parameters of a therapeutic relationship which could interfere with other individuals' attempts to provide [Rebecca] with therapeutic services both now and in the future."[75]

The second DHS allegation was that Booth helped Rebecca run away from NH Cottages.[76]  DHS concluded that "there was a preponderance of evidence that [Booth] either helped [Rebecca] run away from [NH Cottages] and/or picked [Rebecca] up shortly after [Rebecca] ran from the facility which was a failure to supply [Rebecca] with necessary care and a failure to protect [Rebecca] from conditions or actions that seriously endanger [Rebecca's] physical or mental health when reasonably able to do so."[77]

The third DHS allegation was that Rebecca resided with Booth while Rebecca was missing and that Booth engaged in a sexual relationship with Rebecca during that time.[78]  DHS determined by a preponderance of the evidence that Rebecca did reside with Booth while Rebecca was missing, and that an unlawful sexual relationship occurred during that time.[79]  Booth was disqualified from providing direct services as a result of these findings.[80]

Plaintiff alleges that Ross was identified as "P7" in the DHS report.[81]  DHS found that Ross "was made aware by multiple staff persons that [Booth] may have helped [Rebecca] run away from the facility, that [Rebecca] and [Booth] may have been in a

---

[75] *Id.* ¶ 89.
[76] *Id.* ¶ 90.
[77] *Id.* ¶ 91.
[78] *Id.* ¶ 92.
[79] *Id.* ¶ 93.
[80] *Id.* ¶ 94.
[81] *Id.* ¶ 95.

relationship, and that [Rebecca] may have been staying at [Booth's] residence."[82]  Ross

failed to report this information "as required."[83]  Ross was initially "disqualified from a

position allowing direct contact with, or access to, persons receiving services from

facilities licensed by the Department of Human Services, the Department of Health,

facilities serving children or youth licensed by the Department of Corrections, and

unlicensed Personal Care Provider Organizations."[84]

DHS apparently rescinded Ross's disqualification based upon a settlement

agreement reached while Ross's disqualification was on appeal.[85]  Despite the massive

failures by Ross as observed by DHS, Ross remains in her position of significant

authority at North Homes today.[86]  Despite the massive and widespread failures by North

Homes employees as observed by DHS, North Homes claims that it "completed an

*Internal Review* and determined that facility policies and procedures were adequate and

followed by staff persons and that no additional training was necessary."[87]

## II.   Standard of Review

On motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court

accepts as true the complaint's factual allegations and draws all reasonable inferences in

a plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 622, 678 (2009).  A complaint must present

"a short and plain statement of the claim showing that the pleader is entitled to relief."

---

[82] *Id.* ¶ 96.
[83] *Id.* ¶ 97.
[84] *Id.* ¶ 98.
[85] *Id.* ¶ 99.
[86] *Id.* ¶ 100.
[87] *Id.* ¶ 101.

Fed. R. Civ. P. 8(a)(2).  To meet this standard and survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  Although the plausibility standard "requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility,'" it is not a "probability requirement." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).  "Thus 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).  A court must "review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Haney v. Portfolio Recovery Assocs., L.L.C.*, 837 F.3d 918, 924 (8th Cir. 2016) (quotation omitted).

In assessing the motion, the court "may consider some materials that are part of the public record," as well as materials that are "necessarily embraced by the pleadings," including publicly available court documents.  *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

## III.   Argument

The North Homes Defendants seek dismissal of Plaintiff's claims brought pursuant to 42 U.S.C. § 1983.  The North Homes Defendants do not seek dismissal of Plaintiff's alleged state law claims against them. "The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citation omitted).

First, Plaintiff plausibly alleges that the North Homes Defendants acted under color of state law, even though North Homes and the entities it operates are nominally private. Second, Plaintiff plausibly alleges individual Fourteenth Amendment violations under Section 1983 for failure to intervene and supervisory liability. [88]  Third, Plaintiff plausibly alleges a *Monell* claim.  Finally, Plaintiff plausibly alleges a *Canton* claim for failure to train.

### A.      The North Homes Defendants acted under color of state law.

#### 1.  *Whether private actors can be held liable under Section 1983 requires a fact-bound inquiry.*

There is no dispute that the North Homes Defendants are nominally private, but "[t]o act 'under color of state law' does not require the accused be an officer of the state." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).  Private action can be chargeable to the state and thus actionable under Section 1983.  *See, e.g., West v. Atkins*, 487 U.S. 42 (1988) (holding that a private physician who was under contract with the state to provide medical services to inmates at a state prison hospital on a part-time basis acted under the color of state law, within the meaning of § 1983, when he treated inmates).  This makes sense given the statute's historical purpose.  Section 1983 was originally known as the Ku Klux Klan Act and designed specifically to disrupt the strength afforded to the Klan by its entwinement with state actors.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 719 (1978) (". . . § 1983, which was originally enacted as § 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13. . . ").

---

[88] Plaintiff has alleged Eighth Amendment violations in the alternative.

The traditional definition of "acting under the color of state law" requires only that the defendant in a Section 1983 action, whether public or private, "have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49.  Importantly, and seemingly missed by the North Homes Defendants in their Rule 12(b)(1) motion, the question of whether a nominally private entity or person acts under color of state law requires a factual inquiry.  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).  To that end, the Eighth Circuit stated: "Our ultimate conclusion must turn on the particular facts of the case, since '[o]nly by **sifting facts and weighing circumstances** can the nonobvious involvement of the State in private conduct be attributed its true significance.'"  *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)) (emphasis added).

The Supreme Court articulated four tests to determine whether a private individual's actions amount to state action: (1) the public function test; (2) the state compulsion test; (3) the nexus test; and (4) the joint action test.  *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982).  The Court left unanswered "[w]hether these different tests are actually different in operation or simply different ways of characterizing the **necessarily fact-bound inquiry** that confronts the Court in such a situation. . . ."  *Id.*  (emphasis added).  Nevertheless, a finding of state action under **any** of these tests will fulfill the acting "under color of state law" requirement and support a claim under Section 1983.  *Id.* at 935.

In their motion, the North Homes Defendants seek to avoid discovery into this "necessarily fact-bound inquiry" by asking the Court to find, as a matter of law, that Plaintiff's factual allegations and reasonable inferences do not plausibly allege state action. In doing so, the North Homes Defendants ignore the critical factual allegations in the Complaint. Instead, they try to recast North Homes as merely providing "group residential and mental health treatment services" so that North Homes can fit into their collection of irrelevant cases brought almost entirely by *pro se* plaintiffs. But North Homes is much more than it would like the Court to believe.

**2.  *North Homes does not <u>just</u> provide residential treatment; it also provides detention and correctional services.***

North Homes is not merely a group residential and mental health treatment provider, it serves as a detention center. North Homes, through a license with the Department of Corrections (DOC), owns and operates correctional facilities for juveniles, whereby it detains, incarcerates, and commits juveniles, in concert with Minnesota counties, for criminal, mental health and other protective purposes.[89] Its youth residents, including Rebecca, are under 24/7 supervision and are not free to leave the North Homes facilities.[90] Their liberty is entirely restricted.[91] And even when North Homes places or moves a juvenile resident into DHS-licensed units, North Homes maintains complete discretion to move that resident into its DOC-licensed unit.[92] Indeed, North Homes did

---

[89] Complaint ¶¶ 2, 12-15.
[90] *Id.* ¶ 16.
[91] *Id.*
[92] *Id.* ¶¶ 17, 21.

just that to Rebecca in this case.[93]  These are the critical facts alleged in the Complaint.

These are also the critical facts ignored or skirted by the North Homes Defendants in

their motion.  These facts inexorably lead to the conclusion that the North Homes

Defendants act under the color of state law.

In *Kennedy v. Youth Services Int'l*, 18-CV-75 (PJS/BRT) (D. Minn. 2018), the

plaintiff alleged Section 1983 claims against privately-owned Youth Services

International which owned and operated "Elmore Academy," a facility like ITASKIN

that was "licensed by both the Minnesota Department of Human Services and the

Minnesota Department of Corrections."[94]  The identically situated defendants attempted

to dismiss Kennedy's Complaint, arguing, in part, that they did not act under color of

state law.[95]  Youth Services ultimately conceded that it operated under color of state law

at oral argument, and Judge Schiltz recognized that it was not a close call:

> I thought that the plaintiff easily plausibly pled that YSI and its
> employees were acting under color of state law either under the
> public function test or the joint activity test.  I mean, they were
> running the equivalent of a detention facility, and detention
> facilities are the classic state function.  Nobody, except the
> state, can hold somebody against their will.  And I looked
> yesterday and there's just dozens of cases holding that private
> prisons are state actors for Section 1983 purposes, **and this is
> the equivalent of a private prison.**  So I'm glad you are not
> making that argument.[96]

---

[93] Storms Dec. Ex. C at *3-4 ("…the AV was 14 years old and was discharged from the
DOC licensed unit and was admitted to facility A.  The AV stayed at facility A until July
15, 2016, when she was readmitted to the DOC unit.").
[94] *See Kennedy*, 18-CV-75, ECF Doc. No. 27, First Amend. Compl. ¶ 12.
[95] *Kennedy*, 18-CV-75, ECF Doc. No. 33, Mem. Supp. Mot. Dis. at *8-9.
[96] Storms Dec. Ex. C, *Kennedy*, Hearing Transcript at *3 ll 10-20 (D. Minn. May 16,
2018) (emphasis added); *see also Kennedy*, 2018 WL 2271029 (D. Minn. May 17, 2018).

The DOC/DHS facility in *Kennedy* was alleged to be the same type of facility at issue in this case.  North Homes, despite its attempt to skirt this fact, operates a detention center.  Plaintiff made such allegations in her complaint, and this fact is reflected on North Homes' publicly available website.[97]  As in *Kennedy*, North Homes acted under color of state law either under the public function test or joint activity test.  This issue can easily be disposed of in Rebecca's favor, as it was for the plaintiff in *Kennedy*.

### 3.  *North Homes satisfies the public function test.*

The public function test is dispositive.  Under this test, the Supreme Court has "found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974) (citing four cases where the Supreme Court found state action under the public-function test).  This is based on the notion that the state must satisfy certain constitutional obligations when performing its duties and cannot contract out those functions to avoid its obligations.  *See Terry v. Adams*, 345 U.S. 461 (1953).  The constitutional responsibilities attach to the public function being delegated to the private firm, and the private firm thereafter assumes those duties.  *Id.*

Through the public function test, "the Supreme Court has suggested—though it has not actually held—that state prisoners might bring suit under § 1983 against privately owned correctional facilities." *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 40 (5th Cir. 2003) (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 72 n.5 (2001)) ("[S]tate prisoners … already enjoy a right of action against private

---

[97] Storms Dec. Ex. D, Website image from www.northhomesinc.org.

correctional providers under 42 U.S.C. § 1983."); *see also Richardson v. McKnight*, 521

U.S. 399, 413 (1997) (remanding for the district court to determine whether, under

*Lugar v. Edmondson Oil Co.*, two prison guards of a private, for-profit corporation acted

under color of state law).

      While the Supreme Court has strongly suggested it, the circuit courts have held it.

Both the Fifth and Sixth Circuits have expressly held that prisoners may, under the

public function test, pursue Section 1983 actions against private correctional facilities

and their employees: "We agree with the Sixth Circuit and with those district courts that

have found that private prison-management corporation **and their employees** may be

sued under § 1983 by a prisoner who has suffered a constitutional injury." *Rosborough*,

350 F.3d at 461 (emphasis added) (relying, in part, on *Skelton v. Pri-Cor, Inc.*, 963 F.2d

100, 102 (6th Cir. 1991)); *see also Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th

Cir. 1996) (same); *accord Americans United for Separation of Church and State v.*

*Prison Fellowship Ministries, Inc.* 509 F.3d 406 (8th Cir. 2007) (citing *Street* and

holding two non-profit corporations that offered a faith-based residential inmate prison

program were state actors under the joint-action test) (discussed *infra* pgs. 31-32). No

circuit court has held otherwise.

      The federal district courts that have addressed this issue also agree. *See*, *e.g.*,

*Blumel v. Mylander*, 919 F. Supp. 423, 426-27 (M.D. Fla. 1996) (holding private

contractor that contracted with a Florida county to run its jail was a state actor for

purposes of Section 1983); *Giron v. Corr. Corp. of Am.*, 14 F. Supp. 2d 1245 (D.N.M.

1998) (holding that private company performing function of incarcerating inmates and

the correctional guard it employed were acting under color of state law); *Kelser v. King*,

29 F. Supp. 2d 356, 370-71 (S.D. Tex. 1998) (same).

### 4. *Giron* is instructive.

*Giron* is particularly instructive in this case because it dealt with state action in

the context of a private prison guard raping an inmate. 14 F. Supp. 2d at 1246-47. In

that case, plaintiff was an inmate at a correctional facility operated by a private, for-

profit corporation pursuant to a contract with the State of New Mexico Corrections

Department. *Id.* at 1246. One of the correctional guards employed by the corporation

ostensibly entered plaintiff's cell to pick up a food tray and raped her. *Id.* at 1246-47.

In the Section 1983 action, the prison guard moved for summary judgment, arguing he

was not "acting under color of state law" when he raped the plaintiff. *Id.* at 1247-48.

The *Giron* court disagreed. In doing so, the court said that rape was "an act [that]

clearly violated [plaintiff's] constitutional right to bodily integrity." *Id.* at 1248 (citing

*Albright v. Oliver*, 510 U.S. 266 (1994)). The court then applied the public function test

to find state action, holding, "The function of incarcerating people, whether done

publicly or privately, is the exclusive prerogative of the state." *Id.* at 1249. Supporting

its decision, the court emphasized the policy behind the public function test:

> I conclude that the [public] function doctrine applies in New
> Mexico when the state delegates the running of a prison to a
> private contractor. If a state government must satisfy certain
> constitutional obligations when carrying out its functions, it
> cannot avoid those obligations and deprive individuals of their
> constitutionally protected rights by delegating government
> functions to the private sector. The delegation of the function
> must carry with it a delegation of constitutional responsibility.

*Id.* at 1250 (internal citation omitted).

The *Giron* court also implicitly addressed the North Homes Defendants' suggestion in its introductory paragraph that the sexual relationship was outside the scope of Booth's employment.  *Giron* acknowledged the guard knew sexual contact with an inmate would violate corporation policy and did it anyways.  *Id.* at 1247.  But that did not eviscerate state action.  To the contrary, the court held it was state action that made it all possible:

> Torrez forced Giron to have sex with him under color of state law because he exercised coercive authority over her through his employment, and because he used his employment to gain access to her—he used his state conferred authority as a corrections officer to accomplish the deed.  The dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual.  Without state authority, Defendant Torrez would not have been able to gain access to Plaintiff.

*Id.* at 1251 (internal quotations and citations omitted).

### 5. *Juvenile treatment facilities providing correctional and detention services are akin to private prisons.*

It is not just adult correctional facilities; the same holds true for private companies that contract with the state to care for troubled juveniles.  In *LeMoine v. New Horizon Ranch Center*, 990 F. Supp. 498 (N.D. Tex. 1998), the estate of a juvenile who died while involuntarily committed to a private residential treatment center sued the center and the private physician it contracted with under Section 1983.  In that case, the defendants brought the same 12(b)(1) motions that the North Homes Defendants do here, alleging that the court lacked subject matter jurisdiction because they are not state actors.  *Id.* at 501.  The court denied both motions.  In reaching its conclusion, the court

24

rejected the same authority that the North Homes Defendants purport controls here,

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), stating:

> A private day school such as the one in *Kohn* that receives public funding by contracting with a state is very different from a private residential treatment center to which a state has delegated 24-hour care of troubled juveniles. The relationship between [Child Protective Services] and New Horizons is more than merely contractual or regulatory. The State entrusted the well-being and lives of children on a 24-hour basis to New Horizons. Such a plenary delegation of paramount duties to these children inexorably leads to the conclusion that New Horizons' acts are "fairly attributed to the state." Therefore, *Kohn* is entirely distinguishable from the case at bar.

*Id.* at 501.

The court then analogized New Horizons to the private prison cases, highlighting facts that are **all** present in this case: (1) people in custody are there against their will; (2) the state that sends them to either institution; (3) the state pays for their housing, food, medical, and educational needs; (4) residents are not free to choose their own medical caregivers, but are forced to receive treatment from whomever has contracted with the private prison or juvenile residential treatment center; and (5) people are sent to these institutions for past misbehaviors, and society expects some sort of penological process to occur wherein the residents are rehabilitated back into society. *Id.* 501-02. The court then concluded that, "[w]hile New Horizons is not 'private prison' *per se*, it does however have many characteristics of a private prison in the sense that both places involve 24-hour care of people with behavior problems." *Id.* at 502. Thus, under the

public function test, New Horizons and the private physician it contracted with are properly characterized as state actors. *Id.* at 502-03.[98]

### 6. *The common thread is the ability to deprive liberty.*

The impetus behind these decisions is not that prison operation or correctional services have been "traditionally exclusively" a power reserved to the states. As noted in *Richardson v. McKnight*, the privatization of prison and jail operations have existed since at least the eighteenth century. 521 U.S. at 405 ("Private individuals operated local jails in the 18th century, . . . , and private contractors were heavily involved in prison management during the 19th century.") (internal citation omitted). Rather, it is the deprivation of liberty that drives these decisions. The state, acting through its general police powers, has traditionally exclusively had the power to deprive liberty. The *Giron* court explained: "The fact that correctional functions have never been exclusively public does not mean that, because run by a private corporation, that the extent of the government nature of the function is any less. Only the government is empowered to incarcerate a citizen . . .." 14 F. Supp. 2d at 1249. Similar language appears throughout these other cases as well. *See, e.g., Rosborough*, 350 F.3d at 461 ("Clearly, confinement of wrongdoers—though sometimes delegated to private entities—is a fundamentally governmental function.").

---

[98] *Accord*, *Probst v. Cent. Ohio Youth Ctr.*, 511 F. Supp. 2d 862 (S.D. Ohio 2007) (finding that the provision of mental health services to incarcerated persons in a juvenile detention facility is a public function, and as a result, the private non-profit corporation and its social worker that performed the suicide evaluations are state actors).

This deprivation of liberty is also what drives a finding of state action in other similar but non-private-correctional cases.  For instance, in *Plain v. Flicker*, the U.S. District Court in New Jersey used the "public function" test to find state action where the state general granted physicians the power to unilaterally certify institutionalization for individuals suffering from mental health illness, reasoning, "Only the state, pursuant to its police power, has authority to intrude on that liberty."  645 F. Supp. 898, 908 (D. N.J. 1986).  And in *Medina v. O'Neill*, the U.S. District Court for the Southern District of Texas, in holding the conduct of a private firm hired by U.S. Immigration Services to detain aliens was state action, reasoned, "detention is a power reserved to the government, and is an exclusive prerogative of the state."  589 F. Supp. 1028, 1038 (S.D. Tex. 1984), *vacated in part, rev'd in part on other grounds*, 838 F.2d 800 (5th Cir. 1988).  Importantly, this is what is missing from **all** the cases cited by the North Homes Defendants; yet it is undeniable here.

### 7. *The North Homes Defendants' case law is irrelevant.*

The absence of the ability to deprive liberty runs throughout all the North Homes Defendants' state action cases.  Most of their cases are wholly irrelevant.  *Nichols v. Metropolitan Center for Independent Living, Inc.*, 50 F.3d 514 (8th Cir. 1995), involved the discharge of an employee in an **independent** living center for handicap persons.[99]

---

[99] Employee termination or personnel decisions are not actions of the state irrespective of whether the private institution could otherwise be considered a state actor under the public function test.  These cases are thus wholly irrelevant.  Yet the North Homes Defendants resort to citing three such cases:  *Rendell-Baker*, *supra*; *McLaughlin v. Children's Safety Ctrs.*, No. 12-CV-01746, 2013 WL 489036 (D. Minn. Feb. 8, 2013); and *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir. 1992).

*Smith v. University of Minnesota Medical Center—Fairview Riverside*, No. 09-CV-293, 2010 WL 3893902 (D. Minn. July 14, 2010), addressed the complaints of a vulnerable adult that **voluntarily committed himself** to a private hospital and was upset the hospital discharged him after only a couple of weeks. *Dove v. City of New York*, No. 03-CV-5052, 2005 WL 2387587 (E.D.N.Y. Sept. 28, 2005), dealt with a homeless shelter, *Spannaus v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, No. 04-CV-90-728, 1991 WL 55946 (D. Minn. Apr. 10, 1991), a private law firm, *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974), a public utility company, *P.G. v. Ramsey County*, 141 F. Supp. 2d 1220 (D. Minn. 2001), foster parents, and *Sinn v. The Daily Nebraskan*, 829 F.2d 662 (8th Cir. 1987), a student-run newspaper.

The North Homes Defendants only cite three cases that come remotely close to being relevant: *Byng v. Delta Recovery Services, LLC*, No. 6:13-CV-733, 2013 WL 3897485 (N.D.N.Y. July 29, 2013); *Smith v. American Behavior Health Systems ("ABHS")*, No. 2:16-CV-00380, 2018 WL 4100687 (E.D. Wash. Aug. 28, 2018); and *Smith v. Devline*, 239 Fed. Appx. 735 (3d Cir. 2007) (designated as unreported). All three are unreported cases brought be *pro se* plaintiffs involving residential treatment centers (not detention centers). Yet in all three cases the courts stress the lack of any ability to restrain one's liberty.

In *Byng*, for example, the court highlighted the parolee's freedom:

> . . . Plaintiff stated in the complaint that, after completing his six-month stay at Insight House, he then "agreed" to go to Defendant Delta House, which clearly demonstrates that he was not involuntarily sent to Delta House. . . . Moreover, . . . Plaintiff was paying rent to stay at Defendant Delta House, [ ] he had keys to the house so he could come and go as he pleased, and [ ] he had a bank account outside Delta House from which

> Plaintiff claims that he withdrew his money to purchase alcohol and cocaine after the alleged incident with Defendant Wood.
> . . .
> . . . Delta House does not have the authority to return that resident to prison; rather, they notify that individual's parole officer or other governmental entity, who then, at the officer or entity's discretion, files a petition seeking revocation of parole.

2013 WL 3897485 at *7-8.  Similarly, in *ABHS*, the court emphasized that: (1) the plaintiff voluntarily agreed to participate in "community-based residential substance abuse treatment" program in lieu of prison; (2) "ABHS is not a locked facility and does not involuntarily confine clients[;]" and, (3) in the event a resident were to leave the facility, "ABHS is not empowered to take custody of the client."  2018 WL 4100687 at *3, 6.  Lastly, in *Devline*, the court stated that the residential treatment center, in the event of a program violation, did not have the "authority to return the resident to prison[,]" but could only "notify the proper governmental authority, who then determines whether the resident should be returned to prison or remain in the program." 239 Fed. Appx. at 736;[100] *compare with McBryde v. Thomas*, No. CV 12-76-H-DLC, 2013 WL 6199177, *5 (D. Mont. Nov. 27, 2013) ("Although Defendants describe the program as 'voluntary,' Mr. McBryde was not free to walk out of the facility.").

What is absent in the North Homes Defendants' three cases is irrefutably present here; North Homes detains juveniles in its DOC-licensed units and maintains discretion

---

[100] In *Devline*, the court also noted that the *pro se* plaintiff stated that "he has never taken the position that Appellees operated under the color of state law because no such proof is required for a civil rights action under § 1983."  *Id.*

to detain the juveniles placed in its DHS-licensed units.  Rebecca and other residents are
not free to leave.

### 8.   *North Homes also satisfies the joint action test.*

In addition to the public function test, a nominally private actor may also be
deemed to be acting under color of state law, when it engages in joint action with the
state. *See Brentwood*, 531 U.S. at 928-35; *see also Murray v. Wal-Mart, Inc.*, 874 F.2d
555, 559 (8th Cir. 1989) (employer and its employees can be liable under Section 1983
where there is joint activity with the state). In *Americans United*, the Eighth Circuit held
two non-profit corporations that ran a faith-based residential inmate rehabilitation and
treatment program inside a prison were state actors because of joint action.  509 F.3d at
421-23.  In doing so, the Eighth Circuit stated: "[T]he state effectively gave
InnerChange its 24-hour power to incarcerate, treat, and discipline inmates." *Id.* at 423.

Three years later, the District of South Dakota applied *Americans United* to a
private youth detention center **and** its correction officer accused of sexually assaulting
the fifteen-year-old plaintiff.  *High Pipe v. Hubbard et al*, No. CR-08-4183, 2010 WL
2266363 (D.S.D. June 4, 2010).  The *High Pipe* court determined that both were state
actors subject to Section 1983 because of joint action:

> …the State of South Dakota has contracted with [Youth
> Services International] to provide "services for youth
> offenders" and thus, has access to these youth offenders by a
> privilege created by the State through contract. . . . Once a
> youth offender is placed in the facility offered by YSI, YSI is
> responsible for providing education, treatment, oversight, and
> discipline of these individuals. . . . Though YSI maintains its
> autonomy in providing such services and may refuse to accept
> a youth offender into its program, YSI reports to state agents
> on individuals' progress and the occurrence of any major
> incident. . . . As a result, like the private corporations in

> *Americans United*, the State gives YSI all its power over these
> youth offenders and the Court finds, therefore, that YSI and
> Greene, as an employee of YSI, are acting under the color of
> state law for purposes of § 1983.

*Id.* at *2 (record citations omitted).

### 9. *North Homes is as much a state actor as the private parties in* <u>*Americans United*</u>, <u>*High Pipe*</u>, <u>*New Horizon*</u>, <u>*Giron*</u>, *and all the other private prison and detention center cases.*

North Homes operates a correctional facility for juveniles.[101]  Indeed, it is licensed

by the DOC.[102]  Like *Americans United, High Pipe*, *New Horizon*, *Giron*, and the private

prison and detention center cases, the residents at North Homes are not free to leave and

subject to 24-hour supervision.[103]  They are ordered to be there by the State and are at

North Homes against their will.[104]  Rebecca and the other residents are sent to North

Homes because of past misbehaviors, to be punished and rehabilitated.[105]  North Homes

detains juveniles in its DOC-licensed units.[106]  And if a resident in its DHS-licensed unit

misbehaves, unlike *Byng*, *ABHS*, and *Devline*, North Homes can unilaterally detain that

juvenile in its DOC-licensed unit.[107]  It did exactly that to Rebecca.[108]  Like *New

Horizon*, the relationship between Minnesota and North Homes is more than merely

contractual or regulatory, Minnesota and its counties entrusted the well-being and lives of

its children on a 24-hour basis to North Homes.  Such a plenary delegation of paramount

---

[101] Complaint ¶ 2.
[102] *Id.* ¶ 13.
[103] *Id.* ¶ 15.
[104] *Id.* ¶¶ 12, 28-29.
[105] *See id.* ¶¶ 12, 27-28
[106] *Id.* ¶¶ 15-16, 30-31.
[107] *Id.*
[108] *Id.* ¶¶ 30-31.

duties to these children inexorably leads to the conclusion, under both the public function and joint action tests, the North Home Defendants' acts are "fairly attributed to the State."

The same holds true for Defendant Booth.  Like the correctional guards in *Giron* and *High Pipe*, Booth exercised coercive authority over Rebecca through her employment, and because she used her employment to gain access to Rebecca—Booth also used her state conferred authority to repeatedly sexually assault Rebecca.  Booth too is a state actor for the purpose of these Section 1983 claims.

### 10. *The State of Minnesota intended to delegate its constitutional responsibilities to North Homes – North Homes is required to provide its residents with "<u>Due Process</u>."*

When Minnesota chooses to deprive liberty to its people it must satisfy certain constitutional obligations, like due process.  It cannot avoid those obligations and deprive its people of their constitutionally protected rights by delegating this government function to the private sector.  The delegation of that function carries with it the delegation of constitutional responsibilities.  Minnesota intended exactly that when it entrusted North Homes with detaining its juveniles.  Tellingly, and inescapably, Minnesota mandates North Homes provide **due process** to the children under its care: "The license holder must include in the disciplinary plan a system of due process that has been reviewed by the commissioner of corrections."  Minn. Admin. R. 2960.0270, subp. 6(B).  And since due process is only applicable to government actors, *Rendell-Baker*, 457 U.S. at 837, North Homes knew or at least should have known, that with the money the State gave North Homes to care for these troubled juveniles also came the constitutional

B.    **Plaintiff plausibly alleges individual violations of Rebecca's Fourteenth Amendment rights by Ross and Jane Does 1 – 8.**

While Booth has not moved to dismiss Plaintiff's claims against her, Plaintiff has plausibly alleged that Booth violated her Fourteenth Amendment rights.  As a result of their various failures with respect to Booth's unlawful conduct, Plaintiff have plausibly alleges failure to intervene and supervisory liability claims against Ross and/or Jane Does 1 – 8.  The North Homes Defendants' motion should be denied with respect to Count I of Plaintiff's Complaint.

1.    *Plaintiff plausibly alleges that Booth violated Rebecca's Fourteenth Amendment rights*

North Homes and its employees owed Rebecca a duty of protection because she was in their custodial care.  *See Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 292 (8th Cir. 1993); *accord Fields v. Abbott*, 652 F.3d 886, 890-91 (8th Cir. 2011).  Sexual abuse and grooming by a state actor violate that duty and the Fourteenth Amendment.  *See Lee ex rel. Lee v. Borders*, 764 F.3d 966, 971 (8th Cir. 2014) ("Sexual abuse by a state official may constitute a violation of the substantive due process right to bodily integrity, provided the state official was acting under color of state law at the time of the abuse."); *see also Doe 20 v. Board of Educ.*, 680 F. Supp. 2d 957, 973 (C.D. Ill. 2010) ("the allegations of his sexual abuse and sexual grooming clearly shock the conscience and state a substantive due process claim.") (citing *Wudtke v. Davel*, 128 F.3d 1057, 1062-64 (7th Cir. 1997) (additional citations omitted)).  Booth's conduct towards Rebecca was undeniably conscious shocking.

Plaintiff has also plausibly alleged that Booth acted with deliberate indifference to her medical needs.  In order to state a claim for deliberate indifference under the

Fourteenth Amendment (or Eighth), a plaintiff must establish that she suffered "from an objectively serious medical need, and that prison officials knew of the need but deliberately disregarded it." *Dadd v. Anoka County*, 827 F.3d 749, 755 (8th Cir. 2016). Defendants can also be held liable in their individual capacities for their failure to intervene and prevent others from causing constitutional harms, if they also act with deliberate indifference to the constitutional violation. *See, e.g., Bucker v. Hollins*, 983 F.2d 119, 122-23 (8th Cir. 1993).

The objective prong is a question of fact. *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011). "To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). *See Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016) (PTSD is a serious medical need); *see also Dabney v. Sawyer*, No. 9:11-CV-0273, at *8 (N.D.N.Y. Sept. 30, 2013) (PTSD and major depressive disorder among the plaintiff's serious medical needs).

The subjective state of mind requirement of deliberate indifference requires something more than negligence, but something "less blameworthy than purposely causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Schaub*, 638 F.3d at 915 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "An obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate." *Schaub*, 638 F.3d at 915 (citation omitted). "Such a mental state can be inferred, however, from facts that demonstrate that a medical need was obvious and that the officer's response was 'obviously inadequate.'"

34

*Barton*, 820 F.3d at 965; *see also Coleman v. Rahija*, 114 F.3d 778, 786 (8th Cir. 1997)

("The factual determination that a prison official had the requisite knowledge of a

substantial risk may be inferred from the circumstantial evidence or from the very fact

that the risk was obvious.").

"[W]hether an official was deliberately indifferent to the inmate's serious medical

need [is also a] question[] of fact." *Shaub*, 638 F.3d at 915 (citing *Coleman*, 114 F.3d at

785); *accord T.F. v. Hennepin County*, Civ. No. 17-1826, 2018 WL 940621, at *4 (D.

Minn. Feb. 16, 2018) (unpublished) (noting the subjective element is "necessarily fact-

dependent."). As such, the state of mind inquiry is "ill-suited" for review on a motion to

dismiss. *Grose v. Caruso*, 284 Fed. Appx. 279, 285 (6th Cir. 2008) (unpublished)

(reviewing and affirming the denial of a motion to dismiss on deliberate indifference);

*see also Hile v. Jimmy Johns Highway 55*, 899 F. Supp. 2d 843, 849 (D. Minn. 2012)

(fact question "ill-suited" to be resolved on motion to dismiss).

Here, Plaintiff has plausibly alleged that Booth under color of state law engaged in

an improper romantic and sexual relationship with Plaintiff commencing at ITASKIN,

and lasting until Booth was arrested and Rebecca was found. These allegations are

sufficient to plausibly allege a violation of her right to bodily integrity. *Lee ex rel. Lee*,

764 F.3d at 971 (citations omitted). Moreover, Plaintiff has alleged that Rebecca had

serious medical needs, that Booth was aware of Rebecca's serious medical needs, and

that Booth's conduct towards Rebecca exhibited deliberate indifference to those serious

medical needs. Accordingly, Plaintiff has plausibly alleged that her Fourteenth

Amendment rights were violated by Booth.

### 2. *Plaintiff plausibly alleges that Ross and Jane Does 1 – 8 failed to intervene to stop Booth's unconstitutional conduct.*

The 8th Circuit has recognized that individuals acting under color of state law may be held liable for the constitutional violations caused by a fellow employee when the state actor is aware of the constitutional violation and had a reasonable opportunity to prevent the harm from occurring. *See, e.g., Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009) (citations omitted); *see also Smith v. Conway County, Ark.*, 759 F.3d 853, 861 (8th Cir. 2014); *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1073-74 (D. Minn. 2014). In *Colon v. Kenwall*, Civ. No. 1:18-cv-840, 2018 WL 5809863, at *10 (M.D. Pa. Nov. 6, 2018), the court found that allegations similar to those alleged in this case stated a Section 1983 claim for failure to intervene: "For 12 months, Defendant Kenwell did engage in unwanted grooming, touching, and intimate sexual contact with Plaintiff, which Plaintiff communicated to Defendant Kenwell's supervisor and Defendant Harry, but no action was taken." (internal quotes omitted).

Plaintiff has plausibly alleged that Ross and Jane Does 1 – 8 were aware of an inappropriate grooming and/or sexual relationship between Booth and Rebecca while Rebecca was in North Homes' custodial care and/or after Rebecca ran away from North Homes with Booth's assistance. Ross and Jane Does 1 – 8 had a reasonable opportunity (and duty) to report these concerns and ensure these concerns were addressed, but they all failed to do so. Had Ross and/or Jane Does 1 – 8 taken action, the escalation and continuation of the abuse Rebecca suffered could have been avoided. Plaintiff has

plausibly alleged (consistent with the DHS findings) a Section 1983 claim for failure to intervene against Ross and Jane Does 1 – 8.[109]

### 3. *Plaintiff plausibly alleges that Ross and Jane Does 5 – 8 are subject to supervisory liability.*

Supervisors can be held liable under Section 1983 "for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference to or tacit authorization of the violative practices." *Langford v. Norris*, 614 F.3d 455, 460 (8th Cir. 2010) (citation omitted).   The 8th Circuit has described four elements for supervisory liability:

> (1) Received notice of a pattern of unconstitutional acts committed by subordinates;
> (2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts;
> (3) Failed to take sufficient remedial action; and
> (4) That such failure proximately caused injury....

*Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citation omitted).

Plaintiff plausibly alleges that Ross and Jane Does 5 – 8 were aware of the pattern of unconstitutional behavior exhibited towards Rebecca (i.e., grooming or sexual behavior).  Ross and Jane Does 5 – 8 failed to do **anything** to help Rebecca despite the obvious dangers that Booth's inappropriate relationship with Rebecca created.  Ross and Jane Does 5 – 8 permitted this conduct to last **months** without taking remedial action, subjecting Rebecca to further abuse.  These failures caused Rebecca to suffer severe damages, as also recognized by the DHS.[110]

---

[109] Facts further supporting the failures relative to lack of intervention and supervisory liability are also set forth in Storms Exhibit C, the DHS investigative memorandum.
[110] *See* Complaint ¶ 89.

### C.     Plaintiff alleges a plausible *Monell* claim.

There is no vicarious liability for municipal entities under 42 U.S.C. § 1983.  *See Duffle v. City of Lincoln*, 834 F.3d 877, 881 (8th Cir. 2016) (citing *Iqbal*, 556 U.S. at 676); *see also Monell*, 436 U.S. at 694.  In order to state a claim against the entity itself, a plaintiff must plausibly allege that the plaintiff's "constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law."  *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998) (citing *Monell*, 436 U.S. at 691) (internal quotes and citations omitted); *see also R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149*, 894 F. Supp. 2d 1128, 1137-38 (D. Minn. 2012) (plaintiff pleaded plausible *Monell* claim); *see also Sagehorn v. Ind. Sch. Dist. No. 728*, 122 F. Supp. 3d 842 (D. Minn. 2015) (plaintiff pleaded plausible *Monell* claim).

A plaintiff seeking to impose liability on a municipality under § 1983 must allege the existence of a municipal "policy" or "custom" that caused the plaintiff's injury. *Board of Cty. Comm'rs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 403–04 (1997) (citing *Monell,* 436 U.S. at 694) (addition citations omitted).  A custom need not be formally adopted and can be proved by a pattern of practice: "[l]ocal governments … may be sued for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision-making channels."  *Monell*, 436 U.S. at 692.  In order to state a plausible claim for unconstitutional custom, a plaintiff must allege:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*R.S. ex rel. S.S.*, 894 F. Supp. 2d at 1136 (citing *Mettler v. Whitledge,* 165 F.3d 1197, 1204 (8th Cir.1999)).

Discovery is typically required to reveal the precise nature and scope of unconstitutional policies and customs.  In *Sagehorn*, *supra*, Chief Judge John Tunheim aptly noted::

> [T]his case is only at the pleadings stage. "When a complaint is filed, a plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right." But the "liberality" of the pleading standard means that "the failure . . . to specifically plead the existence of an unconstitutional policy or custom, in itself, is not fatal to [a plaintiff's] claim for relief.". . . . Even if a plaintiff cannot identify the full scope of an alleged custom or policy, the key to surviving dismissal is that the "complaint must allege facts which would support the existence of an unconstitutional policy or custom."

122 F. Supp. 3d at 867; *accord Ferguson v. Short*, 2014 WL 3925512 at *8 (W.D. Mo. 2014) (unpublished) (quoting *Crumpley v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004); *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003)).

When considering the cumulative effect of Plaintiff's well-pleaded allegations as a whole, and accepting Plaintiff's allegations as true, Plaintiff has plausibly alleged that North Homes had a custom of deliberately turning a blind eye towards inappropriate

sexual relationships between residents and staff, and encouraging a "code of silence"

amongst staff members to protect North Homes' predatory offenders.[111] *See, e.g., Bakins

v. Gilmore*, 17-C-07566, 2018 WL 4699847, at *3 (N.D. Ill. Sept. 30, 2018) (code of

silence regarding misconduct can serve as basis for *Monell* liability).

Plaintiff has pleaded, and the convictions establish **as a matter of law**, that there

have been three **known** instances of staff-on-resident sexual abuse that have occurred at

North Homes' ITASKIN facility, two of which occurred before Booth's abuse of

Rebecca.  The DHS investigation revealed (and Plaintiff alleges) that despite the sexual

assault of Jane Doe by Devin Wood only two years prior, there was still a widespread

failure at North Homes to stop Booth's grooming and abuse of Rebecca.  In the *Doe v.

North Homes* litigation, Jane Doe similarly alleges widespread knowledge amongst North

Homes' staff about Wood's unlawful relationship with Jane, yet the abuse was allowed to

progress and continue.[112] Jane has also alleged that she was unlawfully retaliated against

by Ross, a final policymaker, for attempting to bring another unlawful relationship to

light.[113] *See Richmond v. City of Brooklyn Ctr.*, Civ. No. 03-3195 (MJD/JSM), 2005 WL

6763198 (D. Minn. Apr. 12, 2015) (post-incident conduct can be viewed for purposes of

ratification).

When considering the cumulative effect of her well-pleaded allegations, Rebecca

has alleged sufficient facts at this early stage of the litigation that, with deliberate

indifference, North Homes and its final policymaker, Ross, permitted and enforced a

---

[111] Complaint ¶¶ 117-18.
[112] Case No. 18-cv-03419, ECF Doc. No. 1 ¶ 35.
[113] *Id.* ¶¶ 45-46.

code of silence that enabled North Homes' employees to prey on minor residents. This was a moving force behind the plausibly alleged violations of Rebecca's Fourteenth Amendment rights.

### D.     Plaintiff alleges a plausible *Canton* claim

A municipal entity can also be held liable for its failure to properly train its employees under the doctrine set forth in *City of Canton*, 489 U.S. 378 (recognizing this is a derivation of *Monell* liability). In order to establish liability under *City of Canton*, a plaintiff must show that supervisors "(1) . . . had notice of the inadequacies, (2) [the] failure to train in a relevant respect evidences a deliberate indifference to the rights of others, and (3) the alleged deficiency in training procedures actually caused plaintiff's injuries." *Cox v. Wallace*, No. 12-cv-11, 2012 WL 3733538, at *4 (E.D. Mo. Aug. 28, 2012) (citing *City of Canton*, 489 U.S. at 390). "The Court in *Canton* sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 64 (2011) (citation omitted); *see also Tirado v. Mont. Cty., P.A.*, 2013 WL 1285487, at *7 (E.D. Pa. 2013 (finding single incident failure to train claim adequately pled against jail) (citing *City of Canton*, 489 U.S. at 391).

When a plaintiff sufficiently pleads these allegations, they "should be afforded the opportunity to conduct discovery on these matters during the usual course of litigation." *Cox*, 2012 WL 3733538, at *4; *see also McDonald v. City of Florissant*, No. 4:10-cv-986, at *2 (E.D. Mo. Oct. 25, 2010) ("Plaintiff alleges that Gerwitz conducted an

unjustified warrantless search of her home, outside his own jurisdiction, and that this was a result of the City's failure to train its force adequately. These allegations state a claim that is plausible on its face and are sufficient to survive a motion to dismiss.").

When considering the cumulative effect of Plaintiff's well-pleaded allegations as a whole, North Homes knew that it has deficient training with respect to preventing and reporting unlawful sexual relationships between North Homes employees and minor residents.  Despite this knowledge and knowledge of the dangers this lack of training posed, North Homes failed to properly train its employees on preventing and disclosing unlawful relationships between employees and minor residents.  After the widespread failures by North Homes employees documented by the DHS with respect to the facts at issue in this case, North Homes still incredibly, and with complete deliberate indifference, maintained that its staff was in need of no additional training.[114]  Plaintiff has alleged a plausible failure to train claim under *Canton*.

E.    **The dismissal of __any__ claim should be without prejudice given the early stage of the proceedings.**

In this Circuit, motions to dismiss are typically granted **without** prejudice in the early stages of the proceedings, as is the case here.  *See Michaelis v. Neb. State Bar Ass'n*, 717 F.2d 437, 438-39 (8th Cir. 1983) ("Ordinarily dismissal of a plaintiff's complaint for failure to comply with Rule 8 should be with leave to amend.  But if the plaintiff has persisted in violating Rule 8 the district court is justified in dismissing the complaint with prejudice.") (internal citation omitted).  In *Orion Investments Edina, LLC*

---

[114] Complaint ¶ 101.

42

*v. Fresenius Mgmt. Servs., Inc.*, Case No. 17-cv-0441, 2017 WL 1401284, at *3, n.4

(PJS/FLN), the Court noted:

> Moreover, even if the Court had granted Orion's motion in its entirety, the Court likely would have dismissed the counterclaim **without prejudice**, and Fresenius likely would have responded by moving to amend its answer to add a more detailed counterclaim. *See CNH Am. LLC v. UAW*, 645 F.3d 785, 795 (6th Cir. 2011) ("Ordinarily, if a district court grants a defendant's 12(b)(6) motion, the court will dismiss the claim without prejudice to give parties an opportunity to fix their pleading defects.")…

(also quoting *Michaelis*, as quoted above). Given the early stage of these proceedings, the dismissal of any claim should be without prejudice.

### F.     The Court should exercise supplemental jurisdiction over the state law claims.

28 U.S.C. Code Section 1367 provides this Court with supplemental jurisdiction over any state law claim that is "part of the same case or controversy" as any claim before the Court under its original jurisdiction. *See Wong v. Minn. Dep't of Human Servs.*, 820 F.3d 922, 932 (8th Cir. 2016) ("Federal law affords a federal court the power to exercise supplemental jurisdiction over a state-law claim if it derives from a common nucleus of operative fact as a claim otherwise within the court's jurisdiction.") (internal quotes and quotation omitted).

In addition to the claims under Section 1983, Plaintiff has alleged Minnesota state law negligence claims against several of the defendants. The North Homes Defendants **did not** move to dismiss Plaintiff's negligence claims asserted against them. Should the Court allow one or more of Plaintiff's Section 1983 claims to proceed against **any** of the defendants, the Court should exercise its supplemental jurisdiction over the remaining

state law claims.  The entirety of this case focuses upon the sexual abuse perpetrated

upon Jane, and the individual and institutional failures which directly and proximately

caused Jane to suffer that harm.  No meritorious basis exists for this Court to decline

exercising supplemental jurisdiction in this matter.

## V.    Conclusion

For those reasons, Plaintiff respectfully requests the Court deny the North Homes

Defendants' Motion to Dismiss.

Respectfully submitted,

**Dated: April 18, 2019**

**SIEBENCAREY, P.A.**                                        **NEWMARK STORMS DWORAK LLC**

/s/ Jeffrey M. Montpetit                                    /s/ Jeffrey S. Storms
Jeffrey M. Montpetit, #291249                        /s/ Paul C. Dworak
901 Marquette Ave., Suite 500                        Jeffrey S. Storms, #0387240
Minneapolis, MN 55402                                 Paul C. Dworak, #391070
Telephone: 612.333.4500                               100 South 5th Street, Suite 2100
Fax: 612.333.5970                                          Minneapolis, MN 55402
jeffrey.montpetit@knowyourrights.com          Telephone: 612.455.7050
                                                                    Fax: 612.455.7051
                                                                    jeff@newmarkstorms.com
                                                                    paul@newmarkstorms.com

**ATTORNEYS FOR PLAINTIFF**